# IN THE COURT OF APPEALS OF IOWA

No. 21-0642
Filed March 30, 2022

**KADING PROPERTIES, LLC, an Iowa Limited Liability Company,**
    Plaintiff-Appellant,

**vs.**

**CITY OF INDIANOLA,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Warren County, Richard B. Clogg, Judge.

Plaintiff landowner appeals from the district court's annulment of a writ of certiorari following the city council's rejection of two site plans for property development. **AFFIRMED.**

Christopher R. Pose of Lillis O'Malley Law Firm, Des Moines, for appellant.

Hugh J. Cain, Brent L. Hinders, and Daniel J. Johnston (until withdrawal) of Hopkins & Huebner, P.C., Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

Following the Indianola City Council's (Council) rejection of site plans[1] for two lots to develop housing, the project developer, Kading Properties (Kading), petitioned for a writ of certiorari. for two lots to develop housing, Kading petitioned for a writ of certiorari. The district court annulled the writ after a hearing. On appeal, Kading argues the writ should have been sustained because the Council acted illegally by not justifying its rejection of the site plans, acting arbitrarily and capriciously in making its decision using factors not provided by the applicable city code, and encroaching on powers reserved for the board of adjustment by Iowa Code section 414.7 (2020). The Council contends that although it did not state its reasons for the denial of the site plans, it was not legally required to do so. Further, it argues it did not act arbitrarily or capriciously as its decision was supported by substantial evidence, including the public comments. And finally, because the Council was ensuring the site plan was compliant with the city requirements, not providing for special uses or exceptions, it did not usurp the responsibilities of the board of adjustment. We address these competing theories once we summarize the background that developed before this appeal.

---

[1] A "site plan" consists of "a map showing the configuration of the property, the location and dimensions of the proposed buildings, landscape data, engineering data and other factual information relating to the intended development of the property." *Kane v. City Council of Cedar Rapids*, 537 N.W.2d 718, 722 (Iowa 1995). This plan allows a city to assure compliance with the city zoning regulations along with other various city codes and requirements. *See City of Johnston v. Christenson*, 718 N.W.2d 290, 299 (Iowa 2006).

**Background Facts and Prior Proceedings.**

Kading owns two lots of land in Indianola, Iowa—Cavitt Creek I and Cavitt Creek II. Both are zoned R-3 for mixed residential development allowing for four to sixteen dwelling units per acre. The area was approved as a subdivision for proposed development. Because each lot exceeded one acre, the city required review and a recommendation to the Council of any site plan by the planning and zoning commission (P&Z).[2] Kading submitted its initial site plans to develop the lots as Cavitt Creek Condominiums I and II. At first, Cavitt Creek I was planned to have 9.6 dwelling units per acre and Cavitt Creek II to have 8.2 units per acre. P&Z recommended rejection of each site plan, but approval of the final plats; at a September 2019 meeting, the Council voted and agreed with the P&Z recommendation. Not to be deterred, within a month Kading submitted a second proposal, this time with 6.8 dwelling units per acre in Cavitt Creek I (or seventeen total units) and 7.7 dwelling units per acre in Cavitt Creek II (equaling 119 total units).

After reviewing the second proposal, the P&Z staff recommended approval of both site plans. At its meeting, however, P&Z voted to recommend approval of Cavitt I, pending a traffic impact study, and to reject Cavitt II. The bases for the denial of the Cavitt II site plan were:

> 1. The development did not provide a minimal effect upon adjacent properties and existing developments; and,
> 2. The proposed improvements were not designed and located within the property in such manner as not to unduly diminish or impair the use and enjoyment of adjoining property.

---

[2] Were the land less than an acre, the director of community development would be able to issue the building permits. Indianola, Iowa, Code of Ordinances § 166.04.

(Citations omitted.)

In the lead-up to the Council's decision, several residents of the area expressed concerns about the development plan. They worried about overcrowding the nearby schools, worsening preexisting traffic problems at peak commute times, and a lack of on-street parking to accommodate the increase in residents and their guests.[3] Many said that there was need for a park or green space rather than new condominiums. Some worried about water drainage in their backyards. One adjacent property owner worried that, because there was no fence planned between her agricultural land and the proposed development, she would be subject to liability if people began coming onto her land, which included a large pond. When Kading completed the traffic study, the city engineer evaluated the results, which showed that even with the development, the streets would maintain the acceptable "A" level of service. But, traffic was expected to increase noticeably (from 2000 cars per day to 3300). The engineer noted that the street was used more heavily than it was planned to be and, as a result, recommended potential improvements including reanalyzing the traffic control for intersections, improving auxiliary lanes, and installing a high visibility crosswalk.

At a January 2020 Council meeting, city staff presented the site proposal. Kading's counsel also had a chance to speak. Then, members of the community, including current Kading property residents and those who lived around the Cavitt Creek area, were given the opportunity to offer opinions. Many of the same

---

[3] Each unit has a garage, and there were limited, additional off-street parking spots within the proposed development.

concerns were voiced about the changing density in the area. Indianola Code of Ordinances section 166.07(3) set out the process for the Council's review of a site plan:

> An electronic file of the plan with all changes recommended by [P&Z], if any, shall be submitted to the Director of Community Development. Upon recommendation from [P&Z] to the Council, the applicant's plan will be put on the agenda for the next regularly scheduled Council meeting, for final approval or disapproval by the Council. If the Council rejects the plan, they will advise the owner or developer of any changes which are desired or that should have consideration before approval will be given. The applicant shall then submit the revised original for certification by the Council. [P&Z] and the Council, in approving or disapproving any site plan and in making recommendations for alterations or amendments to the site plan as presented, shall be governed by the general policies as set out by this chapter in Section 166.05 and the purpose of this chapter as set out in Section 166.01.

At the end of the meeting, the Council members did not discuss amongst themselves or ask questions about any issues with the site plan. Instead, they simply held their vote. Both site plans were denied on a vote of five to one. At no time did the Council ever advise Kading of the reasons for the denial or what recommendations for alterations or amendments might be considered in any revised site plan.

Kading petitioned to the district court for a writ of certiorari, and the court issued a writ. After a hearing on the merits, the court annulled the writ. Kading timely appealed from that ruling.

**Standard of Review.**

Certiorari actions are appropriate "when an 'inferior tribunal, board, or officer' exceeded its jurisdiction or otherwise acted illegally in executing judicial functions." *Ames 2304, LLC v. City of Ames*, 924 N.W.2d 863, 867 (Iowa 2019)

(citation omitted). "We have broadly defined 'judicial functions' for certiorari purposes to include cases where, as here, the challenged action takes place after required notice and an opportunity to be heard." *Montgomery v. Bremer Cnty. Bd. of Sup'rs*, 299 N.W.2d 687, 692 (Iowa 1980). Here, no party disputes that certiorari is the appropriate means to review the Council's actions. We review the district court's ruling for correction of errors at law and, if substantial evidence exists in the record to support them, we are typically bound by its findings of fact. *Osage Conservation Club v. Bd. of Sup'rs*, 611 N.W.2d 294, 296 (Iowa 2000). Our review of the interpretation of ordinances, like of statutes, is also for correction of errors at law. *Hogg v. City Council*, No. 20-1175, 2021 WL 5475586, at *2 (Iowa Ct. App. Nov. 23, 2021).

**Analysis.**

*A. Was the Council required to make findings supporting the rejection of the site plans or offer modifications as the ordinance references?*

At the onset, Kading argues the district court should have sustained its writ of certiorari because the Council acted illegally by not giving any recommendations for modifications when it rejected the site plans. Kading directs us to the language in the city code that states: "If the Council rejects the plan, *they will advise the owner or developer of any changes which are desired or that should have consideration before approval will be given*." Indianola, Iowa, Code of Ordinances § 166.07(3) (emphasis added). To support its argument of illegality, Kading labels the Council's review of the site plans as a "quasi-judicial" proceeding, requiring specific findings of fact. *See Montgomery*, 299 N.W.2d at 694 (discussing the need for findings of fact when a function is or is not quasi-judicial). The Council argues

it was exercising a "legislative" function and the public meeting only allowed citizens an opportunity to express opinions in support of or opposition to the site plans. *See id.* at 693 (finding the county hearing on the rezoning was for the purpose "to aid the Board [of Supervisors] in gathering information to discharge the legislative function"). The district court agreed with the Council. And our supreme court concurs. *See Kane*, 537 N.W.2d at 722 ("The city's code provides the council may approve, approve with modification, or disapprove a revised site development plan by resolution after recommendation from the city planning commission. This process is a part of the mechanics for enforcing the city's zoning code; it is an administrative device whereby the city exercises oversight and control."). The comment-argument format cannot be confused with the evidentiary-adjudicatory hearing found in the board of adjustment setting, where findings and conclusions are mandatory. *See Montgomery*, 299 N.W.2d at 693–94. Kading does just that.

But the wrinkle here is that the Indianola ordinance suggests that once the site plan is rejected, the developer *will* be given modifications to consider. "Generally, substantial compliance requires that a statute or rule 'has been followed sufficiently so as to carry out the intent for which it was adopted.'" *Residential & Agric. Advisory Comm., LLC v. Dyersvile City Council*, 888 N.W.2d 24, 49 (Iowa 2016) (quoting *Bontrager Auto Serv., Inc. v. Iowa City Bd. of Adjustment*, 748 N.W.2d 483, 488 (Iowa 2008)). So we ask: does the "will advise*"* language mandate a duty to advise, or is it merely directory in its function? First, we note that this ordinance purportedly affords notice to the developer of the nature in which a site plan does not comply with the requirements of the city. Because of

the investment in the planning process, it would seem fair to offer the developer, at a minimum, this courtesy of notice. But whether it is required, and more importantly illegal if not given, is an entirely different question.

To counter, the Council contends the ordinance allows it to disapprove the project as a final action without findings or offering comment. Further, the Council maintains that the "will advise" language in the ordinance is a directory duty, not mandatory. "If the 'text of a statute is plain and its meaning clear, we will not search for a meaning beyond the express terms of the statute or resort to rules of construction.'" *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020) (citing *In re Est. of Voss*, 553 N.W.2d 878, 880 (Iowa 1996)). "An ordinance is ambiguous 'if reasonable persons can disagree' on its meaning." *Ames 2304*, 924 N.W.2d at 869. And when an ordinance is ambiguous, we use our typical statutory construction rules with an ultimate goal to determine the legislative intent behind the ordinance. *Id.* "Unless the ordinance defines a word or uses a word with an established legal meaning, we give the words in the ordinance their 'ordinary and common meaning by considering the context within which they are used.'" *Id.* (citation omitted).

Indeed, the district court determined that the word "will" could be read as either allowing the Council to disapprove of a plan without comment or as allowing "serial application after application until the developer gets it right." On our read, we do not believe that these are the only two options. In whole, Indianola Code of Ordinances section 166.07 says:

> 1. Within forty-five (45) days after receiving the application for site plan review as required by Section 166.02 of this chapter, plus the supplement thereto as required by Section 166.03, the Planning

and Zoning Commission shall recommend to the Council to either approve, approve subject to conditions, or disapprove the site plan. Failure by the Commission to act within the time specified herein shall be deemed recommendation for approval of the site plan as submitted, provided that the site plan has been presented to a quorum of the Commission and that the plan as submitted does not conflict with any existing ordinance, statute, rule or law affecting the subject property, and provided further that if additional information is required by the Director of Community Development pursuant to Section 166.03 of this chapter, the time period specified above shall not commence until such information has been filed with the Community Development Department.

2. The Director of Community Development shall promptly notify the applicant in writing of any revisions or additional information needed as required by Sections 166.03 and 166.05. If necessary, the applicant shall make revisions and resubmit the revised plan to the Director of Community Development for acceptance. If the site plan complies with requirements set forth in this chapter, the applicant's plan shall be submitted on reproducible medium to the Planning and Zoning Commission for recommendation to the Council for approval, disapproval or approval subject to conditions.

3. An electronic file of the plan with all changes recommended by the Commission, if any, shall be submitted to the Director of Community Development. Upon recommendation from the Commission to the Council, the applicant's plan will be put on the agenda for the next regularly scheduled Council meeting, for final approval or disapproval by the Council. If the Council rejects the plan, they will advise the owner or developer of any changes which are desired or that should have consideration before approval will be given. The applicant shall then submit the revised original for certification by the Council. The Planning and Zoning Commission and the Council, in approving or disapproving any site plan and in making recommendations for alterations or amendments to the site plan as presented, shall be governed by the general policies as set out by this chapter in Section 166.05 and the purpose of this chapter as set out in Section 166.01.

The most natural reading of ordinance section 166.07 is that the Council has the power to disapprove the plan, as both the potential recommendations in paragraph one and two and the language "final approval or disapproval" in paragraph three suggest. *See* Indianola, Iowa, Code of Ordinances § 166.07. But, the phrase "they

will[4] advise the owner or developer of any changes which are desired or that should have consideration before approval will be given" also indicates the Council is required to alert the developer about the reasons for its rejection. And, even if the Council is reticent about the project, there is no prohibition to a developer applying once again after denial—in fact, according to Indianola ordinance section 166.09, "A site plan that has been denied by the council may be resubmitted by the applicant to the Building and Zoning Department, pursuant to the terms of this chapter and upon payment of appropriate fees." We will hold the Council to their code, which here required them to address the reasons the plan was denied. The Council gave no such justification, and so acted in violation of its own city code.

But, that does not end our review as the impact of this failing depends on whether the duty was mandatory or directory. If the duty was mandatory, the failure invalidates subsequent proceedings; alternately, if the duty was directory, subsequent proceedings are only invalidated if the challenging party can show prejudice. *$99 Down Payment, Inc. v. Garard*, 592 N.W.2d 691, 694 (Iowa 1999). "When the duty imposed by the provision is essential to effect the main purpose of the [code], the provision is mandatory." *Willett v. Cerro Gordo Cnty. Zoning Bd. of Adjustment*, 490 N.W.2d 556, 559 (Iowa 1992); *see also Nelson v. City of Hampton*, 802 N.W.2d 224, 233 (Iowa 2011) (using same approach with city ordinances). "When the duty imposed is not essential to the main . . . objective,

---

4 Merriam-Webster has many definitions for "will," including "used to express futurity" or "used to express a command, exhortation, or injunction." *Will*, Merriam-Webster, https://www.merriam-webster.com/dictionary/will (last visited Feb. 28, 2022). Also, Bryan A. Garner's *Dictionary of Legal Usage* defines "will" the verb as "must; going to; tending to." (3d ed. 2011). It then expounds on the term as a word of authority expressing the obligations of one or both parties. *Id.*

however, the provision is directory." *Willett*, 490 N.W.2d at 559–60. "[W]hen the enactment at issue does not expressly resolve the question, we look to the main objective of the enactment to determine if the requirement is essential to furthering the objective." *Nelson*, 802 N.W.2d at 233. "If the duty is not essential to accomplishing the principal purpose of the statute but is designed to assure order and promptness in the proceeding, the statute ordinarily is directory and a violation will not invalidate subsequent proceedings unless prejudice is shown." *Taylor v. Dep't of Transp.*, 260 N.W.2d 521, 523 (Iowa 1977).

Kading states "[t]he objective of these statutes is to create a set of rules all citizens can rely upon." This is overly broad; more specifically, the language of Indianola Code section 166.07 sends us to sections 166.05 for its general guiding principles and 166.01 for its purpose. *See Nelson*, 802 N.W.2d at 233. ("In this case, the [city] ordinance does not expressly resolve the issue, but the purpose of the condition is expressly described in the opening paragraph of the subdivision regulation chapter."). Indianola Ordinance section 166.01 states:

> It is the intent and purpose of this chapter to establish a procedure which will enable the City of Indianola to plan for and review certain proposed improvements of property within specified zoning districts of the City in order to accomplish the following:
> 1. Promote and permit flexibility that will encourage a more creative and imaginative approach in development and result in a more efficient, aesthetic, desirable and economic use of land;
> 2. Provide minimal effect upon adjacent properties and existing development. To this end, the Planning and Zoning Commission may make appropriate requirements;
> 3. Promote development that can be conveniently, efficiently and economically served by existing municipal utilities and services or by their logical extension;
> 4. Provide for the enhancement of the natural setting through careful and sensitive placement of manmade facilities and plant materials;

       5. Encourage adequate provision for surface and subsurface drainage in order to assure that future development of other areas of the City will be available;

       6. Provide suitable screening of parking, truck loading, refuse disposal, outdoor storage areas and noise from adjacent and nearby property.

And section 166.05 provides, "Any site plan presented shall be designed in such a way as to insure the orderly and harmonious development of property in such a manner as will safeguard the public's health, safety and general welfare, as hereinafter set out."

Based on the language of the city code, then, the main objective is to allow for proper development and planning of the city's land. This procedural defect of failing to provide reasoning, even by Kading's overbroad expectation, is more akin to a "duty designed to assure 'order and promptness,'" than something essential to the ordinance's goals. *See Willett*, 490 N.W.2d at 560. This is a hallmark of a directory duty. *See Taylor*, 490 N.W.2d at 423 ("[S]tatutory provisions fixing the time, form and mode of proceeding of public functionaries are directory because they are not of the essence of the thing to be done but are designed to secure system, uniformity and dispatch in public business.").

Because we have determined this was a directory duty, Kading must show prejudice before we invalidate the proceedings. *Id.* at 523. Kading states it suffered prejudice because, due to the lack of communication from the Council, it has been deprived of the right to develop its lands. Our appellate courts have not enumerated a standard for proving prejudice in this context. But, in other areas of the law, we require a party seeking to prove prejudice to show the error impacted the outcome of their case. *Downing v. Iowa Dep't. of Transp.*, 415 N.W.2d 625,

630 (Iowa 1987) ("[P]rejudice is proven only by showing a reasonable probability that the alleged error affected the outcome of the case. A reasonable probability is one sufficient to undermine confidence in the outcome."). Kading here has not shown the lack of feedback changed the denial of their site plan. As for the failed communication claim, Kading acknowledges P&Z raised concerns about aspects of the projects and the community opposition was also known to it. So, it has not proved prejudice, and we will not invalidate the proceedings.

*B. Was the decision of the Council arbitrary because it considered public comments over considerations under the city code and not supported by substantial evidence?*

Although Kading objects that it was not given reasons for the rejection of the site plans, here it suggests the Council's decision came due to the pressure from citizens against the development. Kading asserts the Council acted arbitrarily and capriciously by deciding to deny the site plans without sufficient evidence to show any part of the site plans violated the city's zoning ordinance conditions. *See Bontrager*, 748 N.W.2d at 491 (noting that certiorari actions can raise only issues of illegality, and "'arbitrary and unreasonable action or proceedings' that are not authorized, are contrary to the statute defining the powers of the board, or are unsupported by facts upon which the board's power to act depends are illegal" (citation omitted)). "Evidence is substantial when 'a reasonable mind would accept it as adequate to reach a conclusion.'" *Perkins v. Bd. of Supr's*, 636 N.W.2d 58, 64 (Iowa 2001) (citation omitted).

"A city council acts arbitrarily or capriciously if it acts 'without regard to the law or facts of the case.'" *Marianne Craft Norton Tr. v. City Council*, No. 08-1704,

2009 WL 3337610, at *5 (Iowa Ct. App. Oct. 7, 2009) (citing *Dawson v. Iowa Bd. of Med. Exam'rs*, 654 N.W.2d 514, 519–20 (Iowa 2002)).

Now, the Council asks that we glean from the public comments concerns the Council may have weighed to make its determination, without knowing which comments justify the denial because it never articulated the reasoning. Despite not providing its reasoning, we do not believe the Council ignored the law or facts in this case. *See Residential & Agric. Advisory Comm., LLC*, 888 N.W.2d at 44 ("The city council's decision to rezone the . . . site was supported by the facts and was not arbitrary, capricious, or unreasonable. The city council made its decision after a full and lengthy consideration of the overall welfare of the city."). Again, section 166.07(3) of the Indianola Code directs the Council to consider the general policies in section 166.05 when approving, disapproving, or making recommendations for alterations to a site plan. Under its ordinances, these general policies include:

> Any site plan presented shall be designed in such a way as to insure the orderly and harmonious development of property in such a manner as will safeguard the public's health, safety and general welfare, as hereinafter set out.
> . . . .
> 2. The proposed improvements shall be designed and located within the property in such manner as not to unduly diminish or impair the use and enjoyment of adjoining property, and to this end shall minimize the adverse effects on such adjoining property from automobile headlights, illuminations of required perimeter yards, refuse containers and impairment of natural light and impairment or pollution of air. For the purpose of this section, the term "use and enjoyment of adjoining property" means the use and enjoyment presently being made of such adjoining property . . . .
> 3. The proposed development shall have such entrances and exits upon adjacent streets and such internal traffic circulation pattern as will not unduly increase congestion on adjacent or surrounding public streets.

4. To such end as may be necessary and proper to accomplish the standards in subsections 1, 2 and 3 of this section, the proposed development shall provide fences, walls, screening, landscaping, erosion control or other improvements.

. . . .

Indianola, Iowa, Code of Ordinances § 166.05.

Throughout the review process of both Kading's first and second applications, the Council collected lots of information not only from Kading, but from the surrounding residents at both meetings and from citizen emails. Some current residents of other Kading properties spoke about the need for affordable housing options in the area and the positive experiences they had with the company. But from residents near the development site, a common theme was concerns with traffic and parking, but also water drainage, overcrowding in schools, and potential liability from additional residents near a neighboring owner's pond. *See Bontrager*, 748 N.W.2d at 496 ("The board was certainly permitted to rely on such anecdotal evidence. In addition, the board may rely on commonsense inferences drawn from evidence relating to other issues, such as use and enjoyment, crime, safety, welfare, and aesthetics, to make a judgment as to whether the proposed use would substantially diminish or impair property values in the area."). And, while the completed traffic study found the service level of the streets would not decrease, the engineer acknowledged existing issues with the street's heavy use that would be compounded by the extra traffic from the developments.

While Kading may be correct that it met the requirements for the R-3 zone, the Council was still beholden to consider the general policies laid out in Indianola Code of Ordinances section 166.05. As substantial evidence exists that the site

plan was not consistent with these requirements, we will not disturb the Council's determination. *See Helmke v. Bd. of Adjustment*, 418 N.W.2d 346, 352 (Iowa 1988) ("More importantly, whether the evidence in a close case such as this one might well support an opposite finding is of no consequence, for the district court cannot substitute its judgment for that of the board of adjustment. . . . Like the district court, we cannot say as a matter of law that the board of adjustment erred in its determination."); *but see Livingston v. Davis*, 50 N.W.2d 592, 596 (Iowa 1951) ("Like many other courts, we have said zoning is an exercise of the police power delegated by the state to the municipality and such delegated power must be strictly construed. . . . A zoning ordinance should not be extended by implication to prevent a use not clearly prohibited.").

*C. Was the Council acting as a board of adjustment, and thus, acting beyond its powers?*

Kading's final argument is that the Council went beyond its powers and into those reserved for the board of adjustment under Iowa Code section 414.7, which reads, in part:

> The council shall provide for the appointment of a board of adjustment. In the regulations and restrictions adopted pursuant to the authority of this chapter, the council shall provide that the board of adjustment may in appropriate cases and subject to appropriate conditions and safeguards make special exceptions to the terms of the ordinances in harmony with its general purpose and intent and in accordance with general or specific rules contained in the ordinance and provide that any property owner aggrieved by the action of the council in the adoption of such regulations and restrictions may petition the board of adjustment direct to modify regulations and restrictions as applied to such property owners.

Section 414.12(2) empowers the board of adjustment "[t]o hear and decide special exceptions to the terms of the ordinance upon which such board is required to pass under such ordinance."

Kading asserts that, by creating a special approval process for lots larger than one acre, the Council infringed on these statutorily-protected duties of the board of adjustment. It points to cases where a city council usurped the board of adjustment's power by determining a party's ability to use land in a way that violates the city's code. *See Holland v. City Council*, 662 N.W.2d 681, 682–83 (Iowa 2003) (denouncing a city ordinance which allowed for specific uses in a floodplain only with the advance approval of the city council because only the board of adjustment has the statutory power to make use exceptions to the ordinance); *City of Des Moines v. Lohner*, 168 N.W.2d 779, 780, 783 (1969) (finding an ordinance, which required those wishing to use lands for certain purposes—even if in the proper zone—to obtain approval from the city council, was in violation of section 414.7 as granting special exceptions and uses are in the exclusive jurisdiction of the board of adjustment).

But Kading confuses the roles of the Council and a board of adjustment. First and foremost, Kading never applied to the board of adjustment, and for good reason. At no point in this site approval process is Kading asking the city to "*make special exceptions to the terms of the ordinances*." Iowa Code § 414.7 (emphasis added). The Council's review was within existing ordinances enacted to offer oversight and control over development of the land, not to allow or deny a special exception. Rather, here, development of a piece of land more than an acre is reviewed by the Council to ensure that the development meets the zoning

regulations. *See Kane*, 537 N.W.2d at 722 ("The approval of a site development plan is not rezoning. . . . The site plan allows the city to assure compliance with the city zoning regulations and other various city codes and regulations."). The Council is not standing in the place of the board of adjustment, but in the place of the city staff that would typically make this determination for smaller parcels. The Council is acting under its appropriate authority and these actions in reviewing the site plans are not a power intended for the board of adjustment as Kading suggests, and so Iowa Code section 414.7 is not applicable as the district court found.

**Conclusion.**

We disagree with the district court's ruling that Indianola Code of Ordinances section 166.07(3) does not require the Council to provide their reasoning when denying a site plan. But, because the duty was directory rather than mandatory and Kading has not proven prejudice, we affirm the district court's decision that we need not invalidate the Council's proceedings. And, as the Council did not act arbitrarily and capriciously by considering factors outside of the ordinances and was not acting in place of the board of adjustment, we affirm the district court's ruling. Therefore we affirm the district court's annulment of Kading's writ of certiorari.

**AFFIRMED.**